**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**November 5, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

| | |
|---|---|
| YELLOW CORPORATION; YRC INC., d/b/a YRC Freight; USF HOLLAND LLC; NEW PENN MOTOR EXPRESS LLC; USF REDDAWAY INC., <br><br> Plaintiffs - Appellants, <br><br> v. <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS; TEAMSTERS NATIONAL FREIGHT INDUSTRY NEGOTIATING COMMITTEE; TEAMSTERS LOCAL NO. 696; TEAMSTERS LOCAL NO. 795; TEAMSTERS LOCAL NO. 41, <br><br> Defendants - Appellees. | No. 24-3111 <br> (D.C. No. 6:23-CV-01131-JAR-ADM) <br> (D. Kan.) |

_____

**ORDER AND JUDGMENT\***

_____

Before **HARTZ**, **TYMKOVICH**, and **FEDERICO**, Circuit Judges.

_____

This litigation followed from the downfall of America's third largest

trucking company after intense but unsuccessful negotiations with its labor

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

unions. Yellow Corporation is suing the International Brotherhood of Teamsters (IBT), the Teamsters National Freight Industry Negotiating Committee (TNFINC), and three Kansas-based Teamsters local organizations (the Locals) for allegedly breaching the terms of their collective bargaining agreement. Yellow Corporation's co-plaintiffs are its four subsidiary operating companies: YRC Freight, USF Holland, LLC, New Penn Motor Express, LLC, and USF Reddaway, Inc. (the Operating Companies). For simplicity, we refer to Plaintiffs collectively as Yellow, while we refer to Defendants collectively as the Teamsters, except where it is necessary to refer to specific parties individually.

The district court granted the Teamsters' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), finding that Yellow had failed to exhaust internal grievance procedures mandated by the terms of the collective bargaining agreement. The district court then entered judgment at the same time that it dismissed the complaint. When Yellow sought post-judgment relief to amend its complaint to include additional facts showing that the Teamsters had repudiated the terms of the collective bargaining agreement, the district court denied relief.

We have jurisdiction to hear this case under 28 U.S.C. § 1291. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1273–74 (10th Cir. 2023). We hold that the district court erred by denying Yellow's post-judgment motion

2

requesting leave to amend. Leave to amend should have been freely given, and assuming, without deciding, that Yellow was bound to grieve its claim, its proposed amended complaint adequately pleaded that the Teamsters had repudiated the collective bargaining agreement's grievance process. We remand this case to the district court to allow Yellow to submit an amended complaint and to conduct further proceedings.

## I

### A

Until it went bankrupt in 2023, Yellow was the country's third largest "less-than-truckload" (carrying goods from multiple shippers in one truck) freight carrier. Yellow employed 30,000 people, and 22,000 of those employees were unionized Teamsters.

At the time this case was filed, Yellow was an active company but in dire financial straits. It had taken on $1.3 billion in debt, including a nearly $730 million loan from the U.S. Treasury. Yellow felt that its best chance at survival was to restructure the company, making the business more efficient by merging the four Operating Companies and consolidating operations at its freight terminals. This restructuring plan, known as "One Yellow," required shifting the roles of many of the Teamsters employed by Yellow.

Yellow's unionized workforce was governed by a collective bargaining agreement called the YRCW National Master Freight Agreement (NMFA). The NMFA was a sprawling agreement between the Operating Companies, TNFINC, and the Locals, with further supplemental agreements governing work at the local level. Yellow Corporation and IBT were not themselves parties to the NMFA.

Under Article 8 Section 6 of the NMFA, Yellow had to present any restructuring plans – called change of operations (CHOPS) proposals – to the Teamsters. Because a CHOPS could affect the seniority rights and work conditions of Teamsters members at a given freight terminal, the NMFA established regional CHOPS committees, evenly divided between employer and Teamsters representatives, to determine the rights of affected employees. Although Yellow generally had the right to restructure its business, it could not actually make changes at any of its freight terminals until a CHOPS was approved by a CHOPS Committee.

The NMFA also established a grievance process for dealing with disputes arising under the agreement. Article 8 Section 1 of the NMFA mandated that "[a]ll grievances or questions of interpretations arising under this National Master Freight Agreement or Supplemental Agreements thereto shall be processed as set forth" in Section 1. Aplt. App. IV at 154. Sections 1 and 2 then described an elaborate process for dealing

4

with different kinds of grievances, with several tiers of review. "All factual grievances or questions of interpretation arising under the provisions of" a supplemental agreement would be first governed by the terms of the supplement before being referred to a National Grievance Committee. *Id.* at 154–55. Questions of interpretation of the NMFA itself would go directly to the National Grievance Committee. If the National Grievance Committee deadlocked, the grievance would then be sent to a higher body known as the National Review Committee. If that committee also deadlocked, the grievance would then go the Yellow and Teamsters presidents to negotiate.

## B

One Yellow began with the restructuring of Yellow's western operations, involving about 20% of its network. This was known as the Phase 1 CHOPS, and it was approved by the Teamsters' CHOPS committee and carried out successfully. But trouble arose once Yellow tried to begin Phase 2 and restructure its remaining network.

Yellow appeals a motion to dismiss under Rule 12(b)(6), so we take all well-pleaded facts in Yellow's complaint as true and construe all reasonable inferences in its favor. *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021). According to the allegations in Yellow's first amended complaint (the operative complaint), the Teamsters decided to stonewall Phase 2. Although the changes required by Phase 2 were substantively the same as

5

Phase 1, the Teamsters rejected the proposed Phase 2 CHOPS as leverage for unrelated wage increases. Yellow tried to cooperate with the Teamsters and made multiple changes to the CHOPS plan to accommodate their demands, but the Teamsters continued to reject the CHOPS. A hearing of the CHOPS committee to consider Phase 2 was scheduled, but then unilaterally cancelled by the Teamsters. Yellow was willing to have Teamsters members, rather than the CHOPS committee, vote on the plan, but Teamsters leadership refused.

Yellow blames Teamsters President Sean O'Brien for this obstinacy. O'Brien opposed One Yellow and stated that "[t]he proposed changes to our contract from [Yellow] are despicable." Aplt. App. I at 105. Although One Yellow was necessary to save the company, Yellow alleges that O'Brien was willing to allow the company to fail as a show of strength ahead of the Teamsters' negotiations with other, larger shipping companies.

As Yellow's finances continued to deteriorate, the company stopped making its required monthly contributions to the Teamsters' healthcare and pension funds because of a lack of liquid cash. This prompted the Teamsters to threaten a strike, which further eroded public confidence in Yellow. Shortly after, Yellow ceased operations and declared bankruptcy.

The Teamsters dispute this narrative. They claim that the terms of the Phase 2 CHOPS violated the NMFA, and that Yellow sought to make

6

fundamental changes to their contractual arrangement with the Teamsters. According to the Teamsters, Yellow is now merely using them as a scapegoat for the company's inevitable demise.

Our role in this appeal is not to weigh these competing narratives, but to determine whether Yellow has stated a claim based on the facts described in its complaint.

## C

On June 27, 2023, roughly a month before Yellow declared bankruptcy, Yellow filed suit against the Teamsters. Yellow sued under § 301 of the Labor Management Relations Act (LMRA), which allow suits in federal district court to enforce collective bargaining agreements such as the NMFA. 29 U.S.C. § 185. Yellow's complaint contained two claims for breach of contract, both arguing that the Teamsters breached their obligations under the NMFA by refusing to hold CHOPS hearings. Count I alleged a breach of contract by the Locals and the TNFINC. Count II alleged that IBT, though not a party to the NMFA, is liable for breaches committed by TNFINC and the Locals. Yellow also alleged that it was "not required to exhaust contractual grievance procedures" because it sought "money damages that are unavailable through those procedures and because the [Teamsters'] conduct constitutes repudiation, waiver, and estoppel of [their] right to compel compliance with those procedures." Aplt. App. I at 150.

7

The Teamsters moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6), arguing that Yellow was required to first exhaust contractual grievance procedures before filing suit but failed to do so. They also argued that the National Labor Relations Board (NLRB) has primary jurisdiction over Yellow's claims and that Yellow Corporation and IBT are improper parties because they are not signatories to the NMFA. On March 25, 2024, the district court granted the motion to dismiss on the grounds that Yellow had failed to exhaust the contractual grievance procedures established by the NMFA.

The district court also denied Yellow's request for leave to amend its complaint if the case was dismissed. The district court noted that Yellow only made that request in a footnote in its briefs opposing dismissal instead of making a separate motion with a proposed amended pleading. At the same time as it granted the motion to dismiss, the district court entered judgment.

When the case was dismissed, discovery was still ongoing. The Teamsters had requested a stay of discovery in November 2023 pending the outcome of their motion to dismiss, but the district court denied this request and set a document production deadline of March 1, 2024. Yet by that date, the Teamsters had "produced what appear[ed] to be less than 1% of . . . their total document production[.]" Aplt. App. IX at 280. On March 1st (the

production deadline), the Teamsters again moved to stay discovery, which was denied. Instead, a new deadline was set for March 15th. Yellow received substantial productions of documents on March 15th, and then again on March 22nd, just a few days before the case was dismissed on March 25th.

Included in these productions were several documents that Yellow argues show the Teamsters' stonewalling of the CHOPS process. Most notable was a portion of the minutes from a Teamsters' meeting where, according to the minutes, O'Brien stated that the Teamsters "do not in any way support Yellow's proposed [CHOPS]." Aplt. App. XI at 260. Also included were statements from Teamsters members and an economist describing Yellow's dire financial state and warning that the jobs of Yellow employees were at risk. Given the short timelines involved, Yellow contends that it diligently processed and reviewed the Teamsters' document productions, but nonetheless was unable to fully review these documents until after the case was dismissed.

On April 22, 2024, Yellow filed a post-judgment motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) and for relief from the judgment under Rule 60(b). Yellow argued that post-judgment relief was warranted both because of "manifest errors of fact and law" by the district court and because "Yellow has discovered new evidence" in the March document productions showing that the Teamsters had

9

repudiated the NMFA's grievance process. Aplt. App. X at 135. In its motion to alter or amend the judgment, Yellow requested leave to file a proposed amended complaint containing allegations based on this new evidence. Yellow then separately moved to file that proposed amended complaint under Rule 15(a)(2).

The district court denied the motion, finding that Yellow's arguments for legal error in its post-judgment motion were duplicative of its previous arguments on the motion to dismiss. As for the newly discovered evidence, the district court explained that it would "not consider evidence outside the pleadings on a motion to dismiss under [Rule] 12(b)(6) except in limited circumstances that do not apply here." Aplt. App. XII at 177–78. The district court also observed that, regardless, "the evidence cited by [Yellow] is duplicative of allegations that are already in the First Amended Complaint, which the court rejected as insufficient[,]" and thus any amendment would be futile. *Id.* at 178.

Yellow timely appealed.

## II

"We review de novo the dismissal of a complaint under [Rule] 12(b)(6) for failure to state a claim for which relief can be granted." *Reznik*, 18 F.4th at 1260. In doing so, we "must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in

10

favor of the nonmoving party, and liberally construe the pleadings." *Id.* (citation modified).

We review the district court's denial of post-judgment motions under Rules 59(e) and 60(b) for abuse of discretion. *Price v. Wolford*, 608 F.3d 698, 706 (10th Cir. 2010); *Johnson v. Spencer*, 950 F.3d 680, 701 (10th Cir. 2020). Likewise, we review denials of leave to amend for abuse of discretion. *See Serna v. Denver Police Dep't*, 58 F.4th 1167, 1172 (10th Cir. 2023). However, "[t]his court reviews de novo a district court's refusal to grant leave to amend a complaint based on the court's conclusion that the amendment would be futile." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239 (10th Cir. 2001).

## III

We mostly confine our discussion to the district court's decision to deny leave to amend on Yellow's post-judgment motion. First, we examine the appropriate standard for such a motion and determine that under these circumstances leave to amend should be freely given. Then, we hold that the district court erred by failing to grant leave to amend because Yellow did not have a reasonable opportunity to amend its complaint to include new allegations based on the March document production. We further hold that the district court committed error in determining that amendment would be futile because Yellow has stated a valid claim that the Teamsters

11

repudiated the contractual grievance process. Finally, we briefly consider, and reject, the Teamsters' claim that this case is subject to the primary jurisdiction of the NLRB.

**A**

We begin by considering the appropriate standard for the district court's decision to deny Yellow leave to amend. "In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely if it appears at all possible that the plaintiff can correct the defect." *Triplett v. LeFlore Cnty.*, 712 F.2d 444, 446 (10th Cir. 1983) (internal quotation marks omitted). Once a motion to dismiss has been granted and judgment has been entered, the proper way to request leave to amend is to "reopen the case pursuant to a motion under Rule 59(e) or Rule 60(b) and then file a motion under Rule 15." *Glenn v. First Nat'l Bank in Grand Junction*, 868 F.2d 368, 371 (10th Cir. 1989). "In that event, in accordance with Rule 15, leave shall be freely given when justice so requires." *Id.* (internal quotation marks omitted).

After the district court's decision, the Supreme Court explained in *BLOM Bank SAL v. Honickman* that for a motion under Rule 60(b)(6), leave to amend should not be given freely, but only when "extraordinary circumstances" justify relief. 605 U.S. 204, 213 (2025) ("The Rule 60(b)(6) standard does not change when a party seeks to reopen his case to amend

12

his complaint."). However, "Rule 60(b) differs from Rule 59(e)" in that a Rule 59(e) motion must be filed within 28 days of the entry of judgment, and so "does not threaten the finality of judgments to the same degree that Rule 60(b)(6) does[.]" *Id.* at 215–16. Thus, *Honickman* does not alter the district court's task in considering Yellow's motion under 59(e).

Generally, leave to amend is not freely given once there has been an entry of judgment. *See Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1087 (10th Cir. 2005). However, we agree with the Seventh Circuit that "Rule 15(a)(2) provides the standard for evaluating post-judgment motions for leave to amend in situations, like this one, where a district court enters judgment at the same time it first dismisses a case." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1033 (7th Cir. 2024) (citation modified); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) ("The *Foman* holding cannot be reconciled with the proposition that the liberal spirit of Rule 15 necessarily dissolves as soon as final judgment is entered."). Because the district court entered judgment at the same time it granted the motion to dismiss, Yellow had limited opportunity to correct its complaint. This differs sharply from our prior cases where "the moving party had an opportunity to seek the amendment before entry of judgment but waited until after judgment before requesting leave." *Tool Box*, 419 F.3d at 1088. To deny Yellow the

13

opportunity to amend in these circumstances would be a decision that "rest[s] on 'technicalities' that r[u]n contrary to 'the spirit of the Federal Rules of Civil Procedure.'" *Honickman*, 605 U.S. at 215 (quoting *Foman*, 371 U.S. at 181–82).

While Yellow was still required to file under Rule 59(e) as a procedural mechanism, the standard for granting the motion is set by Rule 15(a)(2). Under Rule 15(a)(2), "[r]efusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

## B

Now that we have determined the appropriate standard, we consider whether the district court abused its discretion by not granting leave to amend. The district court did not address the liberal pleading standard of Rule 15(a)(2). Instead, it reasoned that "because the [c]ourt finds no cause to set aside judgment under Rule 59(e), it must deny [Yellow's] motion for leave to amend." Aplt. App. XII at 178. The district court erred by applying the typical Rule 59(e) standard rather than freely granting leave to amend per Rule 15(a)(2). Applying the correct standard, we conclude that there are no signs of "undue delay, undue prejudice to the opposing party, bad faith

14

or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed[.]" *Frank*, 3 F.3d at 1365.

This is not a case "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint[.]" *Id.* at 1366. It would have been problematic had Yellow merely been "awaiting a ruling on the motion to dismiss before trying to cure any possible defects" with the intent of making late stage "improvements" to its complaint. *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020). But Yellow had little opportunity to move for leave to amend based on the details of the March discovery production prior to dismissal (and judgment). By failing to produce documents before the March 1st deadline, and then filing a motion for a stay on that date, the Teamsters needlessly delayed the discovery process and prevented Yellow from having a reasonable chance to earlier amend its complaint. Absent any other "justifying reasons for the denial of leave to amend[,]" the district court's decision was an abuse of discretion. *Triplett*, 712 F.2d at 447.

Further, even if we were to apply the Rule 59(e) standard, the district court committed error. "Grounds for granting a Rule 59(e) motion include '(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent

15

manifest injustice.'" *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1153 (10th Cir. 2012) (quoting *Servants of Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir.2000)). Yellow argued the latter two grounds. The district court found no need to correct clear error for the same reasons that it initially dismissed the case. As for newly discovered evidence, the district court stated that it would "not consider evidence outside the pleadings on a motion to dismiss under [Rule] 12(b)(6) except in limited circumstances that do not apply here." Aplt. App. XII at 177–78.

But the new evidence mattered here because it informed the content of Yellow's proposed amended complaint and its ability to make non-conclusory allegations as to the Teamsters' alleged repudiation of the NMFA's grievance procedures. If we were to impose the ordinary Rule 59(e) standard on Yellow's post-judgment motion, newly discovered evidence would be a permissible basis for leave to amend to be granted. As such, the district court abused its discretion in denying the post-judgment motion regardless of whether we apply the standard of Rule 59(e) or Rule 15(a)(2).

## C

Leave to amend need not be given if amendment would be futile. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason[.]" *Watson*, 242 F.3d at 1239–40. The proposed changes in Yellow's complaint related to its argument that it was

16

not required to grieve its claims under the NMFA because grievance would have been futile.[1] The district court had already determined that Yellow could not make a futility argument against exhaustion. As such, it also ruled that even if it were to grant leave to amend, any new allegations bolstering this argument would themselves be futile. We disagree.

To begin, we examine the requirement that internal grievance procedures be exhausted. "Congress has expressly approved contract grievance procedures as a preferred method for settling [labor] disputes[.]" *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965). "The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987). Although these grievance procedures are most commonly used by employees, employers are equally bound by the grievance procedures contained in collective bargaining agreements unless those agreements

---

[1] "Futility" here also refers to whether it would have been futile for Yellow to exhaust the grievance process.

specify otherwise. *See Drake Bakeries, Inc. v. Loc. 50, Am. Bakery & Confectionery Workers Int'l*, 370 U.S. 254, 257–60 (1962).

Yellow contests whether it was required under the NMFA to exhaust internal grievance procedures for the kind of claims it has presented here, but we assume (without deciding) that it was required to do so. Even so, "the exhaustion requirement is subject to a number of exceptions for the variety of situations in which doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy." *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 329–30 (1969).

In *Vaca v. Sipes*, the Supreme Court described two such exceptions. 386 U.S. 171, 185 (1967). First, "[a]n obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures." *Id.* The second situation, which the court then applied in *Vaca*, is where an employee has been blocked from grieving his or her case because the union itself has refused to process the grievance. *Id.*

Two years later, in *Glover*, the Court referenced these two exceptions and then described "another of the most obvious exceptions to the exhaustion requirement – the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile." 393

18

U.S. at 330. The Court went on to find that exhaustion would be futile in that case because the plaintiffs alleged that the union and the employer were acting in concert to engage in racial discrimination in the grievance process. *Id.* at 331.

Yellow has argued that "any further attempt by Yellow to grieve with the [Teamsters] over One Yellow would have been futile." Op. Br. at 34. The Teamsters counter that "the doctrine of futility is categorically inapplicable in the present context." Resp. Br. at 48. There is little precedent to guide us in applying the futility doctrine to a case brought by an employer. *Vaca* and *Glover* were cases brought by employees, and their reasoning does not necessarily apply to cases brought by employers. *See Vaca*, 386 U.S. at 185 ("[B]ecause [grievance] remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant."); *Bautista v. Pan Am. World Airlines, Inc.*, 828 F.2d 546, 552 (9th Cir. 1987) ("*Glover* was not predicated on mere disagreement between the employees and the union on the merits of a grievance, but on the fact that the [grievance board], according to the plaintiffs' allegations, would have been infected with racial bias.")

However, we have previously stated that there is an exception to the exhaustion requirement "where either the union or the employer has repudiated the collective bargaining agreement's grievance procedures[.]"

19

*United Food & Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 945 (10th Cir. 1989) (citing *Vaca*, 386 U.S. at 190); *see also Sidhu v. Flecto Co.*, 279 F.3d 896, 898 (9th Cir. 2002) ("[The plaintiff] can pursue a § 301 claim without exhausting the grievance procedures if [the defendant] repudiated those procedures."). The difference between futility and repudiation in this context may be vague, but we need not define the precise limits of these doctrines in this case. We are comfortable that the law is settled that a party is not required to exhaust internal dispute mechanisms that the other party has entirely disclaimed.[2] This exception is rooted in longstanding principles of contract law and does not undermine the general rule that parties must exhaust the grievance procedures of a collective bargaining agreement. *See Vaca*, 386 U.S. at 185.

---

[2] Yellow framed their argument as one of "futility" in their opening brief, Op. Br. at 50–56, but at oral argument stated that "repudiation stands alone as a reason for excuse" although "either one gets us to where we need to be." Oral Arg. 20:58–21:02, 22:16–18. "Issues raised for the first time at oral argument are considered waived." *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998). However, our precedents do not make clear the relationship between futility and repudiation, and Yellow appears to view repudiation as being tied to futility. *See* Reply Br. at 22–23; *Cf. United Slate, Tile & Composition Roofers, Loc. 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 501 (6th Cir. 1984) (finding futility, rather than repudiation, where the employer never agreed that it was a signatory to the collective bargaining agreement). As such, Yellow has not waived repudiation as an argument. Yellow has argued on appeal that it was excepted from the exhaustion requirement because the Teamsters refused to engage in the grievance procedures outlined by the NMFA. We determine that this claim is best categorized as an argument of repudiation.

In the context of a labor suit against an employer, we have previously stated that "[a]n employer's repudiation may take the form of either an express refusal to abide by contractually established grievance and arbitration machinery, or conduct which renders the employer unable or apparently unable to comply[.]" *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 721–22 (10th Cir. 1986) (internal citation omitted). "A plaintiff must show some specific basis for believing that the breaching party would not submit the matter to arbitration[,]" but a party need not "specifically disclaim the duty to arbitrate" so long as their actions clearly "support[] an inference of repudiation." *Id.* at 722. (holding that an employer's letter announcing the already completed sale of the company effectively repudiated the prior collective bargaining agreement); *see also Sidhu,* 279 F.3d at 899 (employer's written refusal to process employee's grievance constituted repudiation). We apply this same standard here to the union side of the collective bargaining agreement.

Under this standard, Yellow has adequately pleaded repudiation. The proposed amended complaint alleges that the Teamsters categorically refused to support the proposed CHOPS under any circumstances absent renegotiation of the NMFA, and that they made accompanying statements to that effect. IBT sent notices to the Locals to oppose the Phase 2 CHOPS even after it had been revised to meet the Teamsters' demands. And

21

Teamsters President O'Brien publicly stated that the Teamsters "are done making concessions" and that they would "go after [Yellow] with everything we've got[.]" Aplt. App. X at 200. He also allegedly told the Teamsters General Executive Board that the Teamsters' "position is that we do not in any way support Yellow's proposed change of operations" and "will therefore not adhere to any such changes and will reject, up to and including striking, any proposals of such." *Id.* at 202. In addition to stating their refusal to support the Phase 2 CHOPS, the Teamsters walked out of a meeting on the CHOPS in Chicago and unilaterally cancelled a planned CHOPS hearing in Dallas.

These factual allegations supported Yellow's overarching theory that the Teamsters' ultimate plan was to "stall the Phase 2 CHOPS, blindly decline all proposals by Yellow, and foment an illegal strike." *Id.* at 201. It further alleged that O'Brien "believed . . . that the [Teamsters] would be better off if Yellow was gone," was willing to sacrifice the company "to maintain a strong negotiating posture with UPS," and took actions "intended to put Yellow out of business." *Id.* at 194, 218, 221. The proposed amended complaint concludes by stating that "[h]aving already deliberately refused to engage in a grievance process as antithetical to [Teamsters] leadership's goal of driving Yellow out of business, it would have been futile

22

to try and convince the [Teamsters] to engage in another related grievance process[.]" *Id.* at 230.

These portions of the complaint explicitly allege repudiation of Article 8 Section 6 of the NMFA.[3] And, drawing all reasonable inferences in favor of Yellow, they "support[] an inference of repudiation" of the grievance procedures contained in Article 8 Sections 1 and 2 of the NMFA. *Garcia*, 808 F.2d at 722. Yellow properly alleged that the Teamsters repudiated the CHOPS process, so it is reasonable to infer that they would have also refused to participate in a grievance about the CHOPS process. Yellow alleged that the Teamsters intended to fully walk away from the table and force Yellow out of business, not merely that they had a dispute over certain

---

[3] The parties dispute whether the CHOPS hearing procedures under Article 8 Section 6 of the NMFA can fairly be called "grievance" procedures. We do not resolve this dispute. Rather, we read Yellow's claims that the Teamsters intended to stall the Phase 2 CHOPS to carry with it the reasonable inference that they were equally unwilling to hear those same claims through a grievance mechanism under Article 8 Sections 1 and 2.

portions of the NMFA.[4] The Teamsters would necessarily have intended to repudiate all grievance mechanisms if, as Yellow alleges, they "intentionally triggered a death spiral for Yellow." Aplt. App. X at 227.

The Teamsters vigorously dispute that they had any intent to repudiate the NMFA's grievance machinery, much less destroy Yellow itself. But in our current posture, we examine only the complaint and draw all reasonable inferences in Yellow's favor. *Reznik*, 18 F.4th at 1260. Based on its proposed amended complaint, Yellow has adequately pleaded that it was excused from the usual requirement of exhaustion because the Teamsters repudiated the NMFA's grievance process. As such, Yellow's proposed amended complaint was not certain to be dismissed and granting leave to amend was not futile.

**D**

We also note that the Teamsters raise two other defenses on appeal. First, they argue that this case is within the primary jurisdiction of the

---

[4] We also caution that the mere possibility of deadlock between a union and an employer is not the same as repudiation. A union and an employer are likely to have diverging views, and this does not undermine the law's strong preference for internal resolution of labor disputes. *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965). But where one party refuses to even initiate the mechanisms of hearing an internal grievance, the other party cannot be expected to exhaust those procedures. Yellow pleaded more than mere deadlock – it pleaded that the Teamsters walked away from the table entirely.

NLRB. Second, they argue that two parties, Yellow Corporation itself and IBT, are not proper parties and should be dismissed. These arguments were properly raised in the Teamsters' motion to dismiss, but they were not considered by the district court because it dismissed the case on exhaustion grounds.

"Where an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005). On remand, the district court may still consider whether Yellow Corporation and IBT are proper parties. However, the Teamsters also raise a question of primary jurisdiction.

"Primary jurisdiction is a prudential doctrine" that "allows the court to stay the judicial proceedings and direct the parties to seek a decision before the appropriate administrative agency." *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 750–51 (10th Cir. 2005). If the NLRB has primary jurisdiction, the proper course of action would be to stay these proceedings. To ensure that we do not render a decision when we should be "allocating to an administrative agency the first crack at certain matters[,]" *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004), we will briefly address the Teamsters' primary jurisdiction claim here.

25

"When a plaintiff challenges an action that is 'arguably subject to § 7 or § 8 of the [NLRA],' this challenge is within the primary jurisdiction of the NLRB." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 49 (1998) (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245 (1959)) (alteration in original). Section 7 of the NLRA protects the right of employees to organize and collectively bargain, 29 U.S.C. § 157, while section 8 prohibits unfair labor practices, including refusing to bargain in good faith, 29 U.S.C. § 158. The Teamsters argue that Yellow's claim, at its root, is that the Teamsters refused to bargain in good faith over proposed modifications to the NMFA as required by NLRA § 8(b)(3) and (d). Thus, the case is within the primary jurisdiction of the NLRB under *Garmon*.

"When, however, the activity in question also constitutes a breach of a collective-bargaining agreement, the [NLRB's] authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under [§] 301.'" *William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville & Vicinity*, 417 U.S. 12, 16 (1974) (quoting *Smith v. Evening News Assn.*, 371 U.S. 195, 197 (1962)). This case was brought under § 301 as an action for breach of the NMFA. As such, the "*Garmon* doctrine is not relevant[.]" *Id.*

Of course, "simply referring to the claim as a breach of contract is insufficient for the purposes of § 301 federal courts' jurisdiction." *Int'l Bhd. of Elec. Workers, Loc. 71 v. Trafftech, Inc.*, 461 F.3d 690, 695 (6th Cir. 2006)

26

(citation modified). But this is not a case where § 301 is being used as "an end run" around the NLRB "under the guise of contract interpretation[.]" *Loc. No. 3-193 Int'l Woodworkers of Am. v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1299 (9th Cir. 1980). The heart of this case is whether the Teamsters breached the NMFA by repudiating its grievance procedures. While proposals to renegotiate the NMFA were raised, that is tangential to the question of whether the Teamsters first breached the NMFA as it stood. We are satisfied that this is a "genuine [§] 301 contract dispute[.]" *Trs. of Iron Workers Fund v. A & P Steel*, 812 F.2d 1518, 1525 (10th Cir. 1987).

## IV

On remand, the district court should grant Yellow leave to amend its complaint. These amendments need not be limited to the prior proposed amended complaint and can account for changes in the facts since this appeal was filed. *See R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751 (10th Cir. 1975) ("[Rule 15] contemplates allowing amendments freely when justice requires" so long as any changes on remand do not "run counter to the mandate of the appellate court."). We REVERSE the district court's

27

denial of the motion to alter or amend judgment and the motion for leave to amend, and REMAND for further proceedings consistent with this opinion.

Entered for the Court

Richard E.N. Federico
Circuit Judge